IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SANOFI-AVENTIS U.S. LLC, SANOFI-AVENTIS DEUTSCHLAND GMBH, and SANOFI WINTHROP INDUSTRIE,<br><br>Plaintiffs,<br><br>v.<br><br>MERCK SHARP & DOHME CORP.,<br><br>Defendant. | Civil Action No. 16-812-RGA |

**MEMORANDUM ORDER**

Pending before the Court are Defendant's Motion for Summary Judgment of Noninfringement (D.I. 180) and Plaintiffs' Motion to Strike or, in the Alternative, for Leave to File a Sur-Reply (D.I. 219). The issues have been fully briefed. (D.I. 181, 197, 213, 219, 232, 235). For the reasons stated herein, Defendant's Motion for Summary Judgment (D.I. 180) is **DENIED**. Plaintiffs' motion to strike (D.I. 219) is **DISMISSED AS MOOT**.

**I. BACKGROUND**

On September 16, 2016, Plaintiffs sued Defendant for patent infringement. (D.I. 1). Plaintiffs' second amended complaint accuses Defendant of infringing eleven patents[1] that relate to insulin drug formulations and insulin injection pen devices. (D.I. 93, pp. 3-5; D.I. 181, p. 1).

---

[1] The asserted patents are U.S. Pat. Nos. 7,476,652 ("the '652 patent"); 7,713,930 ("the '930 patent"); 8,603,044 ("the '044 patent"); 8,679,069 ("the '069 patent"); 8,992,486 ("the '486 patent"); 9,457,152 ("the '152 patent"); 9,486,587 ("the '587 patent"); 9,526,844 ("the '844 patent"); 9,533,105 ("the '105 patent"); 9,592,348 ("the '348 patent"); and 9,604,008 ("the '008 patent"). Plaintiffs have since dropped seven of these patents. (D.I. 256 at 2). The '486, '105, '348, and '652 patents remain in the case. (D.I. 262 at 4). On December 13, 2017, the PTAB instituted an IPR on all claims of the '652 patent. (*Id.* at 5).

At issue here are the '044, '486, '069, '844, '105, and '005 patents, which the parties refer to as "the OB Pen Patents."[2] (D.I. 181, p. 1; D.I. 197, p. 1). Third-party Ypsomed AG ("Ypsomed") supplies Defendant with components for Defendant's injection pen devices. (D.I. 181, p. 1). Defendant contends that it does not infringe the OB Pen Patents as a matter of law because in February 2009, Sanofi-Aventis Deutschland GmbH ("Sanofi") and Ypsomed signed an agreement granting Ypsomed a license to the rights under Plaintiffs' European patent EP 1 603 611 ("EP 611") and its "equivalent patents" to manufacture and produce components of the OB Pen Patents and sell them to third parties. (*Id.*). Since Ypsomed has a license to the disputed patents, Defendant argues, the doctrines of patent exhaustion and implied license preclude a finding that Defendant infringes. (*Id.* pp. 10-13). Plaintiffs disagree with Defendant's interpretation of "equivalent patents" and Defendant's conclusion that the OB Pen Patents are licensed. (D.I. 197, pp. 1-2). Plaintiffs assert, among other things, that the license is invalid because it fails to specify which patents are licensed and fails to specify a price term, both of which Plaintiffs maintain are essential under German law. (*Id.* p. 11).

Prior to the February 2009 agreement, Ypsomed and Sanofi had entered into other patent license agreements. In April 2008, Ypsomed and Sanofi settled a patent dispute, entering into a settlement agreement that also contained a provision under which Ypsomed would supply Sanofi with components for Plaintiffs' SoloSTAR® pen injector product. (D.I. 181, p. 3; D.I. 197, p. 2). The April 2008 "supply agreement" granted Ypsomed a "non-exclusive, worldwide, non-sublicensable and royalty free right to use [Sanofi's] Intellectual Property Rights to the extent strictly necessary for [Ypsomed] to carry out its obligations" to supply components to Sanofi. (D.I. 201-2 at 11). Sanofi and Ypsomed entered into another agreement in December 2008 to settle an

---

[2] Plaintiff's answering brief mentions only the '044, '486, '069, and '105 patents. (*See* D.I. 197, p. 1).

2

opposition Sanofi had filed against European patent EP 1 568 388 B1 ("EP 388"), owned by Ypsomed.[3] (D.I. 181, p. 4; D.I. 197, p. 3). The December 2008 agreement granted Sanofi:

> a non-exclusive, irrevocable and free of charge license under TecPharma's Patent EP 1 568 388 B1 and all world-wide equivalents claiming the same priority (hereinafter referred to as "Patent", Annex listing all Patent application numbers) to manufacture, use, sell, promote and/or distribute drug delivery devices to administer pharmaceutical substances in the fields of diabetes and thrombosis or any components or subassemblies thereof (hereinafter referred to as "Device/s").

(D.I. 201-3 at 3).[4] During negotiations for the December 2008 license, Ypsomed's initial proposal recited a license to EP 388 only. (D.I. 182 at 343-45). Plaintiffs counter-proposed expanding the license to include "all world-wide equivalents claiming the same priority." (*Id.* at 332-35, 338).

On December 23, 2008, Ypsomed informed Sanofi that it intended to file an opposition proceeding against EP 611 unless Ypsomed and Sanofi could agree to a license. (D.I. 201-4 at 2). At that time Ypsomed provided a proposed license modeled on the EP 388 agreement. (*Id.* at 2-4). On February 3, 2009, Sanofi responded, proposing an agreement under which Ypsomed would agree not to challenge EP 611 and Sanofi would grant Ypsomed immunity from a patent infringement suit by Plaintiff. (D.I. 201-6 at 2, 4-5). Two days later, Sanofi offered a second proposal which would grant Ypsomed a royalty-free license to EP 611 and an option for a license on "all world-wide equivalent patents claiming the same priority as [EP 611]," specifying that, "The Parties shall in good faith negotiations determine the scope, terms and conditions of such a license." (D.I. 201-7 at 2, 4-5). Ypsomed responded the next day by proposing a revised version of the agreement; one of the proposed revisions was to convert the option to an irrevocable non-exclusive license. (D.I. 201-8). In its response, Ypsomed commented on some of the changes in its proposal, stating that, "It is crucial for Ypsomed to include the right to sell the Device to third

---

[3] EP 388 is owned by TecPharma, a subsidiary of Ypsomed that holds Ypsomed's patents. (D.I. 181, p. 3 n.2).
[4] The December 2008 agreement refers to an "Annex listing all Patent application numbers" subject to the license. (*See* D.I. 201-3 at 3-5). The Annex was not filed on the docket.

3

parties, and to have a final understanding on equivalent patents." (*Id.* at 2). Sanofi indicated that it was "willing to accept most of [Ypsomed's] proposed changes," but that it was "important for [Sanofi] to point out that the [provision] in Art. 1(2) shall not include competitors of Sanofi-Aventis." (D.I. 201-9). Therefore, Sanofi proposed a modification to § 1(2)[5] of the agreement so that § 1(2) would read, "The license rights granted under § 1(1) shall include the right to have manufactured the Device by Affiliates of Ypsomed or by a third party contractor." (*Id.* at 4; D.I. 182 at 381). Ypsomed did not explicitly take issue with Sanofi's proposed restriction that the license not cover sales by Ypsomed to competitors of Sanofi-Aventis. (*See* D.I. 201-10). Ypsomed did, however, take issue with the word "contractor," insisting that it be deleted because, "If the patent lapses in the opposition [Ypsomed] would not face any kind of a restriction of the distribution rights to third party contractors." (*Id.*). It thus appears as though Ypsomed opposed Sanofi's proposed restriction, and any restriction that would limit the entities to which Ypsomed could sell.

By February 9, 2009, Sanofi and Ypsomed had both signed the agreement. The agreement ultimately granted Ypsomed a non-exclusive royalty-free license to EP 611 and a non-exclusive royalty-bearing license to "all world-wide equivalent patents claiming the same priority as [EP 611] (hereinafter referred to as 'Equivalent/s')." (D.I. 182 at 381-82). Section 1(2), which deals with the royalty-free license to EP 611, does not include a restriction relating to third party "contractors." (*Id.* at 381 ("The license rights granted under § 1(1) shall include the right to have manufactured the Device by Affiliates of Ypsomed or by a third party and shall include the right to have sold, promoted and/or distributed the Device by Affiliates of Ypsomed or by a third party.") (emphasis omitted)). Section 2(2) of the February 2009 agreement reflects that the parties did not

---

[5] The February 2009 agreement is organized in sections, not articles. It appears as though Plaintiff's reference to "Art. 1(2)" is a reference to § 1(2) of the agreement.

4

reach agreement on the details of the license to equivalent patents, leaving "further details of such a license on Equivalents" to subsequent "good faith negotiations." (*Id.* at 382). The February 2009 agreement contains a provision selecting German law to govern disputes arising under the agreement. (*Id.* at 383). Despite this choice of law provision, the agreements appear to have initially been drafted in English.[6]

After concluding the February 2009 agreement, Sanofi and Ypsomed engaged in subsequent negotiations for a proposed cross-license agreement in September 2011 (D.I. 201-13) and a proposed license agreement in February 2015 (D.I. 201-12). Ypsomed's September 2011 proposal contemplated a cross-license to the WO2003075985 ("WO 985") and WO2007115424 ("WO 424") patents and all of their "world-wide equivalent patents and counterparts claiming the same priority, including all existing and future divisions, continuations, continuations in part, reissues, re-examinations and utility models claiming the same priority." (D.I. 201-13 at 8). Ypsomed's February 2015 proposal would have granted a "non-transferable, world-wide and free of charge license under EP [2 600 922 ("EP 922")] and all its equivalent patents, patent applications, reissues, re-examinations, extensions, divisions and continuations claiming the same priorities as EP 922 (all together the 'Patent')." (D.I. 201-12 at 3).

Defendant asserts that the "equivalent patents" provision of the February 2009 agreement grants Ypsomed a license to the OB Pen Patents because the agreement "defines 'equivalent patents' as patents 'claiming the same priority as [EP 611],'" and the OB Pen Patents claim the same priority as EP 611. (D.I. 181, pp. 8-9). Therefore, Defendant contends, summary judgment

---

[6] The executed February 2009 agreement is written in English and attached to an email also drafted in English. (D.I. 182 at 380-383). The same is true of the subsequent September 2011 and February 2015 agreements. (D.I. 201-12, 201-13). An English-language version of the executed December 2008 agreement is presented as an attachment to an email drafted in German. The exhibit containing the December 2008 agreement also includes a translation of the German-language email, presented with the English-language December 2008 agreement as an attachment. (D.I. 201-3).

5

is appropriate because Ypsomed's sale to Defendant of injection pen device components manufactured under that license exhausts Plaintiffs' patent rights in the components sold. (*Id.* pp. 10-11). Plaintiffs submit that I should deny summary judgment, arguing that the "equivalent patents" in the license do not cover the OB Pen Patents, and that the license is invalid under German law. (D.I. 197, pp. 11, 14-15).

## II. APPLICABLE LAW

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other

6

materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247-49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322.

## B. German Law

The parties agree that I should apply German law to resolve their dispute, and each has offered a German law expert to opine on the substance of the relevant German law. (*E.g.*, D.I. 182 at 675-710 ("Haedicke Declaration"); D.I. 200 ("Bodewig Declaration")). The substance of the relevant German law is a question of law appropriate for resolution at the summary judgment stage. *See* Fed. R. Civ. P. 44.1.

The parties' experts appear to agree that a contract governed by German law is invalid if it fails to specify an essential term. In a patent license, essential terms include the patents covered by the license and the price term. (D.I. 197, p. 11; D.I. 200 at 8, ¶ 23 (citing Bürgerliches Gesetzbuch [BGB] [Civil Code] § 154 (hereinafter "BGB")); D.I. 213, pp. 5-6, 8-9 (responding to Plaintiffs' argument that the February 2009 agreement is invalid for failure to specify essential terms by asserting that all essential terms are adequately specified, rather than arguing that German law allows a patent license to omit a recitation of the licensed patents or the price term)).

7

The parties' experts disagree as to the role of the parties' intent in German contract interpretation when the language of the contract is clear. Defendant's expert maintains, "German courts generally apply the terms of a contract as they are written," because "[t]here is a presumption that the document reflects the complete and correct wording of the contract." (D.I. 182 at 677, ¶ 8). When contract language "is clear on its face, that language is viewed as establishing the intent of the parties," and "in the absence of evidence that the parties had a shared understanding that deviated from the clear language, German courts apply the clear language of the agreement." (*Id.* at 678, ¶ 10). Therefore, according to Defendant's expert, "the party wishing to establish [a] deviating interpretation" must prove "the facts that support a contractual interpretation which deviates from the literal meaning of a written contract." (*Id.* at 677, ¶ 8). Plaintiffs' expert disagrees, asserting that under German law, the intent of the parties and the contract's overall purpose must always be considered. (D.I. 200 at 5, ¶ 13 (citing D.I. 202-3, BGB § 133 ("When a declaration of intent is interpreted, it is necessary to ascertain the true intention rather than adhering to the literal meaning of the declaration."[7]))). According to Plaintiffs' expert, the German contract law principle of "prohibition of letter interpretation" precludes a court from considering only the words of a contract in interpreting its meaning. (*Id.* at 6, ¶ 14).

When contract language is ambiguous, and the parties do not have a shared understanding, however, the experts agree that German law applies "objective contract interpretation" to determine the meaning of contract language.[8] (D.I. 182 at 679-80, ¶ 16; D.I. 200 at 6, ¶ 16). Applying objective contract interpretation, the experts agree that a court must determine:

---

[7] Defendant's expert explains that, "Under German law, a contract is concluded through corresponding declarations of intention ('Willenserklärungen') (offer and acceptance), which are directed to the formation of a contract. Those declarations are subject to contractual interpretation." (D.I. 182 at 677, ¶ 7).

[8] Plaintiffs' expert maintains that objective contract interpretation "applies even if one at first believes the language of an agreement is 'clear.'" (D.I. 200 at 7, ¶ 19).

8

how an objective counterparty ('objektiver Empfängerhorizont") acting in good faith would understand declarations in a contract. This analysis takes into account the contractual language, the circumstances, and the special skills and knowledge of the person making the declaration (for example, whether the person is a lawyer), as far as these facts were (or should have been) known to the counterparty.

(D.I. 182 at 679-80, ¶ 16; D.I. 200 at 7, ¶ 17). Among the circumstances to be considered are the "behavior of the contracting parties including all side aspects . . . especially prior negotiations and preliminary discussions, the economic rationale, and the history of the contractual relationships." (D.I. 182 at 680, ¶ 17). The parties also appear to agree that evidence from subsequent contract negotiations between the parties may be considered in determining how an objective counterparty would interpret a prior contract. (D.I. 197, pp. 17-18 ("[U]nder German law, a party's post-contracting conduct is evidence of 'what the parties wanted and intended at the moment the contract was concluded.'" (citing Defendant's expert's deposition testimony)); D.I. 213, p. 9 (Defendant arguing that subsequent negotiations support its interpretation)).

The determination of how the objective counterparty would understand the contract is then used to decide whether the parties' proffered interpretations of the contract language are reasonable. (D.I. 182 at 680-81, ¶ 18; D.I. 200 at 7, ¶ 19). According to Plaintiffs' expert, "If a Court applying objectivized interpretation determines that both parties had a reasonable but different understanding, then there is an ambiguity and the contract is invalid under German law due to lack of a meeting of the minds." (D.I. 200 at 8, ¶ 21). If, on the other hand, "a court determines that only one party's understanding was reasonable and thus discernible for the other party, then that reasonable understanding governs." (*Id.* ¶ 22). Defendant's expert implies that if only one party's interpretation is reasonable, the Court should apply the reasonable interpretation. (*See* D.I. 182 at 681-83, ¶¶ 19-26). Defendant's expert does not address the question of how to proceed after determining that both parties' interpretations, although different, are reasonable.

9

Defendant does not, however, dispute Plaintiffs' expert's statement that when the parties' interpretations are different but reasonable, there is no contract. *(See id.*; D.I. 213, pp. 6-8).[9]

## III. ANALYSIS

Defendant maintains that the patents at issue are licensed under the "equivalent patents" provision of the 2009 agreement because Defendant's interpretation of "equivalent patents" is objectively reasonable, whereas Plaintiffs' interpretation of "equivalent patents" is not. (D.I. 213, p. 7). Plaintiffs counter that because "equivalents" and "equivalent patents" do not have commonly-understood meanings, and the scope of "equivalent patents" was never identified during negotiations for the 2009 agreement, the agreement is invalid for failure to specify which patents are licensed. (D.I. 197, p. 11). Alternatively, Plaintiffs argue that Defendant is not entitled to summary judgment because it has failed to prove that Plaintiffs' interpretation of "equivalent patents" in the February 2009 agreement is unreasonable. (*Id.* pp. 12-14).[10]

I first address whether the contract language is clear. The parties appear to agree that there is no default understanding of "equivalent patents" in German law. (D.I. 200 at 14, ¶ 36; D.I. 201-33 at 7-8 (Haedicke Dep. at 80:23-81:13) (admission by Defendant's expert that he was "not familiar with" and had not "ever used the term 'equivalent patents' before")). Each party has offered a different understanding of the term "equivalent patents." Whereas Defendant contends that "equivalent patents" include "any Sanofi patent that claims priority to GB 822" (D.I. 181, p. 9), Plaintiffs argue that "equivalent patents" are limited to patents that (1) "hav[e] the same claim scope as EP 611," and (2) "claim the same priority as EP 611" (D.I. 197, p. 14). In other

---

[9] Instead, Defendant argues that Plaintiffs' interpretation is not reasonable. (D.I. 213, pp. 7-8).
[10] The parties raise additional disputes about the agreement, such as whether changes in European competition law invalidated the agreement, and whether Plaintiff terminated the agreement. (D.I. 181, pp. 14-18, 19-20; D.I. 197, pp. 6-8, 19-20). Having found the parties' dispute about the "equivalent patents" provision is dispositive of Defendant's motion, I will not address these additional issues.

10

words, Defendant argues that "claiming the same priority" defines a "world-wide equivalent patent," whereas Plaintiffs assert that equivalency and priority are two separate requirements for a patent to be licensed.

I find the plain language of the contract equally susceptible to the two interpretations advanced by the parties. The relevant language grants Ypsomed a "non-exclusive and royalty-bearing license on all world-wide equivalent patents claiming the same priority as [EP 611] (hereinafter referred to as 'Equivalents.')." (D.I. 182 at 382). The parties thus appear to agree that, for purposes of the February 2009 agreement, an "equivalent patent" must claim the same priority as EP 611, but they disagree as to whether an "equivalent patent" must also have the same claim scope as EP 611. As the parties' dispute illustrates, however, the language of the license is unclear. It can be read to specify that a "world-wide equivalent[]" patent is a patent "claiming the same priority as" EP 611, or be read to recite two requirements for a patent to be licensed and qualify as an "Equivalent"—the patent must be (1) a "world-wide equivalent" (2) "claiming the same priority as" EP 611. That a first patent claims the same priority as a second patent does not compel the conclusion that the first patent has the same claim scope as the second patent. For example, the claim scopes of two continuations-in-part may differ from one another, even though both continuations-in-part claim priority to the same parent application. It is also possible, however, that two patents claiming the same priority have the same claim scope. For example, two patent applications filed in different countries may have the same claim scope and claim priority to the same parent application. Accordingly, the parties' apparent agreement that a patent must claim the same priority as EP 611 to be licensed under the February 2009 agreement does not clarify the meaning of "equivalent patents." Since I find the term "equivalent patents" susceptible to both parties' interpretations, I conclude that "equivalent patents" does not have a

11

clear meaning, and that the parties' differing interpretations of the term render it ambiguous. Accordingly, I cannot say the contract language is clear.

Having found the contract language ambiguous, I apply objective contract interpretation under German law. If I find Plaintiffs' interpretation of the contract language objectively reasonable, I must deny Defendant's motion for summary judgment. How an objective party in Ypsomed's position would understand the contract sets the benchmark for determining whether Plaintiffs' interpretation of the contract is reasonable. An objective party would likely begin with the language of the contract, but would also consider the facts surrounding the negotiations in formulating a reasonable interpretation of the contract language.

As a threshold matter, an objective party in Ypsomed's position at the time of the contract would seek a license with the broadest possible scope, while simultaneously understanding that Plaintiffs' goal would be to grant a license with the narrowest possible scope. In other words, an objective counterparty in Ypsomed's position would consider the effect of Plaintiffs' business positions as well as Ypsomed's business positions to interpret the language of the contract in a reasonable way that accounts for both. Absent evidence suggesting that one party's interpretation is correct, an objective party would likely understand provisions of the contract to have a meaning that balances the parties' positions and confers benefits to each party.

The parties largely agree on the facts relevant to the 2009 agreement. During negotiations for the February 2009 agreement, the parties exchanged several emails that included proposed drafts of the agreement. In one such email, Ypsomed stated that, "[i]t is crucial for Ypsomed to include the right to sell the Device to third parties. and to have a final understanding on equivalent patents." (D.I. 201-8 at 2). It is undisputed that § 2(2) of the 2009 agreement leaves to "good faith negotiations" the resolution of "further details of such a license on Equivalents" beyond the

statements in § 2(1). (D.I. 182 at 382). Additionally, the December 2008 agreement, which contains nearly identical language to the February 2009 agreement,[11] but which also refers to an "Annex listing all patent application numbers" covered by the license. (D.I. 201-3 at 3-5). The reference to the Annex suggests that an objective party reading the December 2008 agreement would not have been able to discern the scope or meaning of "equivalent patents" in the December 2008 agreement based on the language in that agreement alone (without the Annex). The December 2008 agreement thus provides little insight into the meaning of "equivalent patents." If anything, one might infer from the December 2008 agreement that the February 2009 agreement may be incomplete for failure to identify "equivalent patents." On balance, these facts support the inference that an objective party in Ypsomed's position had not adopted a particular meaning for "equivalent patents," and would not know which patents qualify as "equivalent patents" without further negotiations or clarification.

Defendant contends that the subsequent licensing proposals between Sanofi and Ypsomed in September 2011 and February 2015 support Defendant's interpretation that "equivalent patents" in the February 2009 agreement are patents claiming the same priority as EP 611. (D.I. 213, pp. 8-9). I disagree.

The September 2011 proposal by Ypsomed contemplated a cross-license to the WO 985 and WO 424 patents and all of their "world-wide equivalent patents and counterparts claiming the same priority, including all existing and future divisions, continuations, continuations in part,

---

[11] Both parties acknowledge that the February 2009 agreement was based on the December 2008 agreement. (D.I. 181, p. 5; D.I. 201-6 at 2). The December 2008 agreement is a royalty-free license, whereas the February 2009 agreement for Equivalents is royalty-bearing. Notwithstanding this difference, both agreements grant irrevocable (subject to certain conditions), non-exclusive licenses on all world-wide equivalents claiming the same priority as the primary patent at issue. (*See, e.g.*, D.I. 182 at 382 (granting "non-exclusive and royalty-bearing license on all world-wide equivalent patents claiming the same priority as [EP 611]"); D.I. 201-3 at 3 (granting "non-exclusive, irrevocable and free of charge license under TecPharma's Patent EP 1 568 388 B1 and all world-wide equivalents claiming the same priority")).

13

reissues, re-examinations and utility models claiming the same priority." (D.I. 201-13 at 8). Defendant urges that this language defines "equivalent patents" to include "all existing and future divisions, continuations, continuations in part, reissues, re-examinations and utility models claiming the same priority." (D.I. 213, p. 9). Therefore, Defendant contends, the September 2011 proposal supports Defendant's position that "equivalent patents" in the February 2009 agreement refers to any patent claiming the same priority. (*Id.* pp. 8-9). Defendant ignores that by reciting "equivalent patents" separately from "counterparts claiming the same priority," the September 2011 proposal suggests that "equivalent patents" are not the same as "counterparts claiming the same priority." This suggestion runs counter to Defendant's assertion that any patent "claiming the same priority" would qualify as an "equivalent patent." To be sure, the September 2011 proposal provides evidence that Sanofi and Ypsomed later contemplated licenses encompassing any patent claiming the same priority as the patent(s) recited in the licenses. It also suggests, however, that when Ypsomed and Sanofi intended a license to cover any patent claiming the same priority as the recited patent, they employed additional language to do so, which language is not present in the February 2009 agreement. Accordingly, the plain language of the September 2011 proposal appears inconsistent with Defendant's interpretation of "equivalent patents" as used in the February 2009 agreement.

The February 2015 proposal by Ypsomed would have granted a "non-exclusive, irrevocable (subject to §2 (2) only), non-transferable, world-wide and free of charge license under EP 922 and all its equivalent patents, patent applications, reissues, re-examinations, extensions, divisions and continuations claiming the same priorities as EP 922 (all together the 'Patent')." (D.I. 201-12 at 3). In this February 2015 proposal, "claiming the same priorities as EP 922" modifies "equivalent patents, patent applications, reissues, re-examinations, extensions, divisions

14

and continuations." The recitation of "equivalent patents" as a separate item in a series that also lists "patent applications, reissues, re-examinations, extensions, divisions and continuations" suggests that these other documents are not necessarily included within the scope of equivalent patents. Even if "equivalent" is read to modify each of "patents, patent applications, reissues, re-examinations, extensions, divisions and continuations," however, the agreement separately recites "equivalent" and "claiming the same priorities," suggesting that the two terms impose separate requirements to determine the scope of the license. Accordingly, contrary to Defendant's interpretation of "equivalent patents," the February 2015 proposal suggests that in the February 2009 agreement, the scope of "equivalent patents" must be something narrower than any patent claiming the same priority as EP 611.

I therefore conclude that an objectively reasonable counterparty in Ypsomed's position, considering all of the evidence, would understand the February 2009 agreement to recite "all world-wide equivalent patents" as a separate and distinct requirement from "claiming the same priority as [EP 611]." Though the evidence contemporaneous with the negotiations surrounding the 2009 agreement does not provide guidance as to the objectively reasonable interpretation of that agreement, the conclusion of "separate and distinct" requirements finds support in subsequent negotiations between Ypsomed and Plaintiffs.[12] Having concluded that Plaintiff's interpretation

---

[12] The parties appear to agree that subsequent patent licensing agreements may provide evidence for the objectively reasonable meaning of the February 2009 agreement under German law. (D.I. 197, p. pp. 17-18; D.I. 213, p. 9). Even if German law would not recognize the use of evidence from Ypsomed's subsequent patent licensing agreements with Plaintiffs to determine the objectively reasonable meaning of the February 2009 agreement, however, I would deny Defendant's motion. Without the subsequent agreement evidence, I would conclude on the record before me that an objectively reasonable party in Ypsomed's position would not know the meaning of "equivalent patents" in the February 2009 agreement without further clarification. The February 2009 agreement would thus be invalid for failure to specify the essential term of which patents are covered. Regardless, given the lack of information about the meaning of "equivalent patents" in the February 2009 agreement, it seems to me that an objectively reasonable party in Ypsomed's position would find reasonable any interpretation of the agreement that is not inconsistent with the agreement's language. This would include Plaintiffs' interpretation. Therefore, Defendant's interpretation would not be the sole reasonable interpretation of the agreement, and German law would require me to deny summary judgment on that basis.

15

is consistent with the objectively reasonable interpretation under German law, I conclude that Defendant is not entitled to judgment as a matter of law.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (D.I. 180) is **DENIED**. Plaintiff's motion to strike (D.I. 219) is **DISMISSED AS MOOT**.

IT IS SO ORDERED.

Entered this <u>16</u> day of May, 2018.

_Richard G. Andrews_
United States District Judge